FILED
2016 Dec-06  PM 02:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| HARRIKA IKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:16-cv-0406-JEO |
| | ) | |
| UNITED STATES | ) | |
| DEPARTMENT OF VETERANS | ) | |
| AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is a sexual harassment case.  Plaintiff Harrika Ike brings claims against

her employer, the United States Department of Veterans Affairs (the "VA"), under

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*;

the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)(1); and Alabama tort law.  (Doc.[1]

1 ("Complaint" or "Compl.")).  The VA has moved to dismiss the Complaint for

failure to state a claim, pursuant to FED. R. CIV. P. 12(b)(6).  (Doc. 11).  Upon

consideration, the court[2] concludes that the motion is due to be granted.

---

[1]Citations to "Doc(s). ___" are to the document numbers of the pleadings, motions, and other materials in the court file, as compiled and enumerated on the docket sheet by the Clerk. Pinpoint citations are to the page of the electronically filed document in the court's CM/ECF system, which may not correspond to the pagination on the original "hard copy" of the document presented for filing.

[2]This action was assigned to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 and the court's general order of reference dated January 1, 2015.  The parties

## I.    BACKGROUND

The salient allegations of the Complaint are as follows: Plaintiff is female. At all times relevant, she was employed by the VA as a Medical Support Assistant at the VA Medical Center in Birmingham.  (Compl. ¶ 3).  Plaintiff asserts that between October 2012 and March 2015 she was sexually harassed by a male co-employee, Jonathan Troupe, another Medical Support Assistant who worked with her in the cardiology department on the sixth floor of the VA facility.  (*Id.* ¶ 7). Troupe's alleged harassment included:

* showing Plaintiff graphic pornographic photos on his cell phone;

* showing Plaintiff photos of a v----a;

* stating to Plaintiff, "I wonder how good you could suck my d---k";

* repeatedly talking to Plaintiff about "f---ing a doctor";

* repeatedly playing sexually explicit music in front of Plaintiff;

* asking Plaintiff if she had oral sex with her husband;

* repeatedly making "sexual noises" into his phone when he knew Plaintiff could hear him;

* telling Plaintiff, "My p---s is hard, I'm horny";

have consented to an exercise of plenary jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c) and LR 73.2.  (Doc. 13).

      \*       commenting to Plaintiff that in order to eat a grapefruit, one must "eat it like a p---y";

      \*       telling Plaintiff on more than one occasion that he "had p---y for lunch"; and

      \*       telling Plaintiff on numerous occasions that he had masturbated in the bathroom at work.

(*Id.*)

Plaintiff alleges that, on one or more unspecified occasions, she "verbally reported the sexual harassment to her supervisors," but it continued.  (*Id.* ¶ 6).  She further says that she "filed an EEO [Equal Employment Opportunity] internal complaint with the Defendant on July 24, 2013."  (*Id.*)  The VA purportedly took no action, however, until January 2014, when it reassigned Troupe to another department on the seventh floor, one above where Plaintiff continued to work.  (*Id.*)  Plaintiff alleges, however, that she "continued to see Mr. Troupe on a daily basis, as he would come to her floor," and her duties regularly required her to go to his floor.  (*Id.*)  The stress from the situation, she says, caused her to become suicidal and required her to leave her job for extended periods of time during 2014, 2015, and 2016, to seek mental health treatment.  (Compl. ¶¶ 9, 11).

On March 9, 2016, Plaintiff filed this action, naming the VA as the sole defendant.  She raises claims under Title VII, alleging that she was subjected to

3

sexual harassment and a hostile work environment. (Compl., Counts I & III). She also raises a federal-law claim under the EPA. (*Id.*, Count II). Finally, Plaintiff raises tort claims under Alabama state law for "outrage," negligence, and wantonness. (*Id.*, Counts, IV, V, and VI, respectively).

The VA has moved to dismiss the Complaint for failure to state a claim upon which relief can be granted. (Doc. 11). First, the VA maintains that Plaintiff's state-law claims are all "preempted by Title VII and should be dismissed with prejudice." (*Id.* at 5-6). Next, the VA contends Plaintiff has failed to state a cognizable claim under the EPA. (*Id.* at 7-9). Finally, the VA maintains in its lengthiest argument that the Title VII claims are due to be dismissed for failure to timely exhaust administrative remedies. (*Id.* at 10-20). The VA also contends that, to the extent that Plaintiff suggests that she suffered harassment after the VA took corrective action against Troupe, her allegations fail to state a cognizable claim under Title VII. (*Id.* at 20-21; *see also* Doc. 25 at 5-6).

In support of its arguments related to Plaintiff's Title VII cause of action, the VA has filed an evidentiary submission. (Docs. 11-1 through 11-8). It is comprised of documents generated in connection with a pre-suit EEO investigation into Plaintiff's complaints of sexual harassment, including a 75-page transcript of an interview that Plaintiff gave under oath to an EEO investigator on

October 1, 2015, in the presence of her attorney, Richard Horsley.  (Doc. 11-3, Interview of Plaintiff ("Pl. Int.")).  Based on that interview and other exhibits, the VA has proffered a timeline of events (Doc. 11 at 12), the material factual accuracy of which Plaintiff has not disputed for present purposes.  (*See* Doc. 16 at 2-3).  In response, the court offered Plaintiff an opportunity to submit additional evidence and argument relating to the issues raised by the VA.  (Doc. 21).  Plaintiff accepted that invitation.  (*See* Docs. 22, 23).  The VA has also filed reply briefs in support of its motion to dismiss.  (Docs. 18, 25).

In her EEO interview Plaintiff alleged that Troupe began making repeated, sexually explicit and otherwise harassing remarks to Plaintiff and in her presence in about July 2012.  (Pl. Int. at 18[3]).  That harassment continued, she said, until she took maternity leave for three months starting in February 2013.  (*Id.* at 11; Doc. 11-8 at 3).  When she returned in May 2013, however, Troupe's harassment resumed.  (Pl. Int. at 11; Doc. 11-8 at 3).  The VA's materials further establish that Plaintiff's first report about Troupe's sexual harassment were verbal complaints on July 24, 2013, made to her agency supervisor, Nurse Manager Brenda Mostella, and to Mostella's supervisor, Marie Todd.  (Pl. Int. at 20; Doc. 11-4, Interview of

---

[3]Citations to "Pl. Int. at ___" are to the page of the transcript, not the electronically-filed document.

Brenda Mostella ("Mostella Int.") at 5-6, 10-13; Doc. 11-5 at 3; Doc. 11-9 at 48).

At that time, Plaintiff also completed VA Form 119, captioned, "Report of

Contact," detailing her allegations of Troupe's sexual harassment. (Doc. 11-5;

Doc. 23 at 3-4)[4]. She says that she gave that form to Mostella, who, in turn,

forwarded it to the human resources department. (Doc. 11-9 at 48; *see also*

Mostella Int. at 5-6, 24-25).

Plaintiff claims that after reporting the sexual harassment to Mostella,

Troupe approached her later that same day. (Pl. Int. at 17). At that time, she says,

he was "so upset" and asked her, "Did y'all have an issue with me?" (*Id.*)

Plaintiff did not answer. (*Id.*) He finally told her that if she had "any problems

with [him]," she "need[ed] to come to [him] and not run ... to the manager." (*Id.*)

This caused Plaintiff to become distraught and leave work. (*Id.*)

Notwithstanding Plaintiff's allegation in her Complaint that the VA took no

action in response to her July 24, 2013, sexual harassment complaint until January

2014, Plaintiff now admits that such is, in fact, not what occurred. Rather, it is

undisputed that on July 25, 2013, the very next day after Plaintiff complained, the

VA responded by permanently transferring Troupe to another department on the

---

[4]A copy of Plaintiff's completed "Report of Contact" form has been filed by each side, by the VA as Doc. 11-5 and by Plaintiff as Doc. 23 at 3-4. While both are legible, the latter is the sharper copy.

floor above where Plaintiff worked.  (Pl. Int. at 15, 20; Doc. 11-6; Doc. 11-9 at 48;

Doc. 16 at 2-3; Doc. 22 at 1-2).  Also on July 25, 2013, the VA sent Troupe a

memo detailing Plaintiff's claim against him and notifying him that his alleged

conduct would violate the VA Medical Center's sexual harassment policy.  (Doc.

11-7).  He was further warned that any similar incidents in the future would "not

be tolerated" and could result in his "immediate termination" and that his

"interaction with [Plaintiff] should be for business purposes only and conducted in

a professional manner" (*Id.*)  Finally, Troupe was made to attend sexual

harassment prevention "refresher training."  (*Id.*; Mostella Int. at 25).  That

training was administered in a one-on-one session on July 29, 2013, by the

agency's EEO Program Manager, Rick DeFilippo, who had been contacted by

Mostella "and/or" the agency human resources department about Plaintiff's

complaint.  (Doc. 11-9 at 2-4, Declaration of DeFilippo ("DeFilippo Decl.") ¶ 6).

DeFilippo expressly denies, however, that he had up to that time ever been

contacted by Plaintiff about Troupe's sexual harassment.  (DeFilippo Decl. ¶ 6).

    Plaintiff also now admits that once Troupe was reassigned, he ceased

subjecting her to any comments or conduct of a sexual nature.  (*See* Doc. 16 at 3

("[T]he sexual harassment stopped when [Troupe] was moved to a different

floor"); Pl. Int. at 15-16).  Indeed, not only does Plaintiff not claim he made any

further inappropriate remarks or statements, her testimony suggests that they never spoke again.  However, Plaintiff complained in her EEO interview that she felt she was still being harassed in that she was being required, as a practical matter, to see Troupe on a daily basis because she had to go to his floor to perform certain work duties.  (Pl. Int. at 15-16, 20).  She also says that, on occasions when she would see him, "he would make faces at [her]" and "would look at [her] certain ways," or "he would walk by and whistle."  (Pl. Int. 15).  In addition, Plaintiff recounts a particular episode in which, during a training class of medical support assistants in February 2015, Troupe sat "right in front of [her]" and "stared at [her] with a mean look."  (*Id.* at 38, 43; *see also* Doc. 11-9 at 54).

In November 2013, Plaintiff called the agency EEO Program Manager, DeFilippo, telling him that she wanted to file a complaint for sexual harassment. (Pl. Int. at 12, 63; DeFilippo Decl. ¶ 7).  He told Plaintiff to send him an email, which she did, on November 25, 2013.  (Pl. Int. at 12-13, 63; Doc. 11-9 at 47-48; DeFilippo Decl. ¶ 7).  In memo attached to that email, Plaintiff related the following:

> I filed a sexual harassment case against Jonathan Troupe on Wednesday, July 24, 2013.  I reported this case to my immediate supervisor, Brenda Mostella RN, and Marie Todd RN who is Brenda's supervisor.  Both supervisors were very concerned and willing to take immediate action.  My Point of Contact report was

8

given to Brenda Mostella the very next day, July 25, 2013. Mrs.
Mostella immediately forwarded my report to Human Resources and
as a result, Jonathan was relocated to another floor.  Since that date,
July 24, 2013, I have not heard nor been advised of anything
concerning this case.

(Doc. 11-9 at 48).  Plaintiff's memorandum further indicated that she was not

satisfied with the VA's response to her sexual harassment complaint and that she

considered the situation "unresolved."  (*Id.*; *see also* Pl. Int. at 39).  That was so,

she stressed, because Troupe had been back to her work area "a few times,"

ostensibly to use the copier, though Plaintiff was "sure" he had a machine in his

own department.  (Doc. 11-9 at 48).  Plaintiff complained that she had reported

"that incident about two months ago to Human Resources" but had yet to receive a

response.  (*Id.*)  She further averred that Troupe "gives [her] an angry look if [she]

pass[es] him in the hallway" and that he had "also given the same angry look to

[her] husband," causing her to "worr[y] that some words might be exchanged

between [Troupe and her husband]."  (*Id.*)  Finally, she explained that "still

see[ing] Troupe ... ma[de her] nervous" and was "caus[ing] panic attacks and even

nightmares," requiring her to be "under the care of a therapist and psychiatrist"

and to take "two forms of anxiety medications along with an antidepressant."  (*Id.*)

In addition to her Memorandum, Plaintiff attached to her email a copy of the

"Report of Contact" form she said she had completed and given to Mostella on or

9

about July 24, 2013.  (DeFilippo Decl. ¶ 7).

In response to her email, DeFilippo contacted Plaintiff's supervisors the next day, asking that they discuss generally with Plaintiff the corrective action that had been taken against Troupe.  (DeFilippo Decl. ¶ 8; Doc. 11-9 at 50).  To that end, it appears that Mostella did speak with Plaintiff during this period, telling her, in essence, that the VA considered its response to have been appropriate and that no additional measures were contemplated.  (Pl. Int. at 15, 21; Doc. 11-9 at 50).  DeFilippo scheduled a follow-up meeting to discuss the situation with Plaintiff and Mostella at the end of January 2014, but it was postponed due to a snow storm.  (Pl. Int. at 13; Doc. 23 at 8); *see also* DeFilippo Decl. ¶ 8).  There was an attempt to reschedule the meeting for early February 2014, but it was again scuttled because Mostella said she had to attend an out-of-town training class.  (Pl. Int. at 13; Doc. 23 at 8); *see also* DeFilippo Decl. ¶ 8).

On February 27, 2014, Plaintiff's physician recommended that Plaintiff take a medical leave of absence due to severe anxiety, depression, and post-traumatic stress disorder ("PTSD"), allegedly caused by Troupe's sexual harassment and by her continuing to see him at work.  (Doc. 11-8 at 2; Doc. 23 at 7).  On that same date, Plaintiff began a medical leave that lasted approximately seven months. (Doc. 11-8 at 2; Doc. 23 at 7).  When she returned in September 2014, however,

Troupe was still assigned to the floor above her, and Plaintiff claims she continued to see him on a daily basis as before.  (Doc. 23 at 7).

On February 27, 2015, Plaintiff sent DeFilippo another email, which she characterized as "as a formal complaint" regarding her sexual harassment case involving Troupe.  (Doc. 11-9 at 54; *see also* DeFilippo Decl. ¶ 11).  She there complained, "Since I've returned to work [in September 2014 following a medical leave], I have seen [Troupe] numerous times and each time I see him I begin to panic."  (Doc. 11-9 at 54).  Plaintiff also referenced the aforementioned episode from February 2015, in which "[Troupe] came in and sat directly across from [her]" at a meeting of medical support assistants.  (*Id.*)  As a result of seeing him there, she said, she left the meeting and had "an aggressive panic attack" for which she was hospitalized from February 19-22, 2015.  (*Id.*)  She reiterated that "continuing to have to see him" made her "very uncomfortable" and that her "health [was being] jeopardized."  (*Id.*)  She concluded by asking DeFilippo to notify her of any other steps she needed to take.  (*Id.*)

On March 2, 2015, DeFilippo responded with an email telling Plaintiff that if she wanted to file an EEO complaint about the matter she would need to contact the agency's Office of Resolution Management ("ORM").  (Doc. 11-9 at 54; DeFilippo Decl. ¶ 11).  The next day, Plaintiff called an EEO Counselor with the

ORM, Grallin Butler, who interviewed her on March 4, 2015. (Doc. 11-8 at 2-4).

The parties thereafter agreed to submit Plaintiff's claim to alternative dispute

resolution ("ADR"). (*Id.*) Meanwhile, sometime in March 2015, Troupe left the

VA to take a job with the Social Security Administration, whereupon he and

Plaintiff no longer came into contact. (Doc. 23 at 7; Pl. Int. 31; Mostella Int. at

23). On April 15, 2015, the parties participated in the ADR session, but it did not

bear any fruit. (Doc. 11-8 at 4).

On April 17, 2015, EEO Counselor Butler completed his final report and

gave Plaintiff written notice of her right to file a discrimination complaint with the

agency. (Doc. 11-8 at 4). On April 28, 2015, she completed and submitted VA

Form 4939, captioned, "Complaint of Employment Discrimination." (Doc. 23 at

6-9). There, Plaintiff demanded "lost wages" and "compensation for mental

anguish" allegedly caused by Troupe's sexual harassment and being required to

see him following his transfer to the seventh floor. (*Id.*) In addition, Plaintiff

claimed that she "first reported [Troupe's sexually harassing] conduct to Mr. Rick

DeFilippo on July 24, 2013," whom Plaintiff identified as her "supervisor." (*Id.* at

6, 7). "On that date," Plaintiff alleged, "I filed an in-house EEO complaint, which

DeFilippo never forwarded to any other office." (*Id.* at 7). DeFilippo, by contrast,

denies ever being Plaintiff's "supervisor" (DeFilippo Decl. ¶ 6) or that she

12

contacted him about her sexual harassment claim until November 2013.  (*Id.* ¶ 7).

## II.   REVIEW STANDARDS

Rule 12(b)(6) of the FEDERAL RULES OF CIVIL PROCEDURE authorizes a motion to dismiss a complaint on the ground that its allegations fail to state a claim upon which relief can be granted.  Such a motion tests only the sufficiency of the claim set out in the plaintiff's pleadings.  *Harris v. Proctor & Gamble Cellulose Co.*, 73 F.3d 321, 324 (11th Cir. 1996).  Thus, the "'issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Little v. City of North Miami*, 805 F.2d 962, 965 (11th Cir. 1986) (quoting *Scheur v. Rhodes*, 416 U.S. 232, 236 (1974)).  Faced with a Rule 12(b)(6) motion, the court is ordinarily limited to considering the complaint itself and must assume that its allegations are true and give the plaintiff the benefit of all reasonable factual inferences.  *Hazewood v. Foundation Financial Group, LLC*, 551 F.3d 1223, 1224 (11th Cir. 2008) (per curiam).  Generally speaking, if the court considers evidentiary materials beyond the complaint in connection with a motion to dismiss under Rule 12(b)(6), the motion must be treated as one for summary judgment under Rule 56, FED. R. CIV. P.  *See* Rule 12(d), FED. R. CIV. P.; *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1054 n. 12 (11th Cir. 2015).

The VA has also moved pursuant to Rule 12(b)(6) to dismiss Plaintiff's Title VII cause of action, on the ground that she allegedly failed to timely exhaust administrative remedies.  Such a motion is appropriately considered under Rule 12(b) rather than under Rule 56 despite the court's consideration of materials beyond the complaint, and, should it become necessary, the court itself is authorized to resolve disputed issues of fact relevant to the defense but not going to the merits of the claims. *See Bryant v. Rich*, 530 F.3d 1368, 1374-77 (11th Cir. 2008); *Brady v. Postmaster Gen., U.S. Postal Serv.*, 521 F. App'x 914, 916-17 (11th Cir. 2013); *Tillery v. United States Dep't of Homeland Sec.*, 402 F. App'x 421, 424-26 (11th Cir. 2010).  However, district courts are generally required to employ a procedure akin to that used at summary judgment insofar as the non-movant must be afforded notice and a reasonable opportunity to develop the record as it relates to circumstances relevant to the administrative exhaustion defense.  *See Bryant*, 530 F.3d at 1276 & n. 14.

## III.   DISCUSSION

### A.    Equal Pay Act Claim and State-Law Claims

The VA moves to dismiss Plaintiff's EPA claim (Count II) and her state-law claims for "outrage," negligence, and wantonness (Counts IV, V, & VI) under Rule 12(b)(6).   In response, Plaintiff concedes that those claims are due to be

14

dismissed. (Doc. 16 at 2). And so shall they be, with prejudice. With that, the court proceeds to consider the VA's motion as it relates to Plaintiff's only other claims, which arise under Title VII.

### B.    Title VII Claims

Title VII provides in relevant part that "all personnel actions affecting" enumerated federal employees "shall be made free from any discrimination based on ... sex." 42 U.S.C. § 2000e-16(a). This statute, which applies to the VA, *see e.g., Irwin v. Department of Veterans Affairs*, 498 U.S. 89 (1990); *Trask v. Secretary, Dep't of Veterans Affairs*, 822 F.3d 1179 (11th Cir. 2016), expanded Title VII coverage to federal employees to the same extent as it was applicable to non-federal employees. *See Putman v. Secretary, Dep't of Veterans Affairs*, 510 F. App'x 827, 829 (11th Cir. 2013) (citing *Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1243 (11th Cir. 1998)).

Actionable employment discrimination under § 2000e-16(a) may include subjecting an employee to sexual harassment that is so severe or pervasive that it alters the terms and conditions of employment and creates a hostile work environment. *See Trask*, 822 F.3d at 1195; *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-68 (1986) (recognizing the viability of a sexually hostile work environment claim under 42 U.S.C. § 2000e-2(a), the analogous Title VII

15

provision applicable to non-federal employers).  To make out such a hostile

environment claim, a plaintiff must demonstrate the following:

> (1) he or she belonged to a protected group, (2) he or she was
> subjected to unwelcome harassment, (3) the harassment was based on
> [sex], (4) the harassment was sufficiently severe or pervasive to alter
> the terms and conditions of his or her employment and create an
> abusive working environment, and (5) a basis exists for holding the
> employer liable.

*Trask*, 822 F.3d at 1195 (citing *Gupta v. Florida Bd. of Regents*, 212 F.3d 571,

582 (11th Cir. 2000)).  The fourth element above contains both an objective and a

subjective component.  *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir.

1999) (en banc).  That is, the "environment must be one that 'a reasonable person

would find hostile or abusive' and that 'the victim ... subjectively perceive[s] ... to

be abusive.' "  *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21

(1993)).  Furthermore, "the objective severity of harassment should be judged

from the perspective of a reasonable person in the plaintiff's position, considering

'all the circumstances.' "  *Id.* (quoting *Oncale v. Sundowner Offshore Services,*

*Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at 23)).

As a threshold matter, the court notes that Plaintiff has pled her Title VII

cause of action in two separate counts.  The first is described more generically as a

claim under "Title VII of the Civil Rights Act" based on "sexual harassment."

(Compl. Count I).  The other count is captioned as a claim for a "Hostile Work Environment Violation of Title VII."  (Count III).  However, insofar as Plaintiff may be trying to pursue two distinct sex discrimination claims in these counts, she cannot do so.  "Sexual harassment" is only actionable under Title VII where it is so severe or pervasive that it rises to the level of a "hostile work environment" as that phrase is employed in the law.  *See Meritor Sav. Bank*, 477 U.S. at 67; *Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998).  And here, both Title VII counts are founded on the same allegations: that Troupe sexually harassed Plaintiff and that, when she complained about it, the VA did not do enough to remedy the situation because she was still required to see him at work on a regular basis.  (*Compare* Compl. ¶¶ 5-9 *with id.* ¶¶ 12-13).  Thus, both Count I and Count III in substance assert the same Title VII cause of action, and the claims in those counts are subject to a single legal analysis.  *See Keeton v. Big Lots Stores, Inc.*, 84 F. Supp. 2d 1290, 1298-99 (N.D. Ala. 2015).  With that, the court turns to the parties substantive arguments as they relate to such claims.

## 1.    Timeliness of EEO Counseling

The VA has moved to dismiss Plaintiff's Title VII cause of action on the ground that she allegedly failed to timely exhaust administrative remedies before filing this action.  With respect to such exhaustion, the Eleventh Circuit has

explained as follows:

> Before bringing a Title VII action in court, a federal employee must first seek relief from the agency where the alleged discrimination occurred. *Brown v. General Servs. Admin.*, 425 U.S. 820, 832 (1976). "This requirement is not a technicality; '[r]ather, it is part and parcel of the congressional design to vest in the federal agencies and officials engaged in hiring and promoting personnel primary responsibility for maintaining nondiscrimination in employment.' " *Grier v. Secretary of Army*, 799 F.2d 721, 724 (11th Cir. 1986) (quoting *Kizas v. Webster*, 707 F.2d 524, 544 (D.C. Cir. 1983)).  In accordance with the congressional design, the Equal Employment Opportunity Commission ("EEOC") has adopted regulations setting forth the procedure that employees must follow in presenting discrimination claims to federal agencies. *See* 29 C.F.R. § 1614.101 *et seq.* These regulations provide, *inter alia*, that an aggrieved employee must "initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory...." 29 C.F.R. § 1614.105(a)(1).  The purpose of this counselor-contact requirement is to allow the agency an opportunity to investigate the claim internally and "try to informally resolve the matter." *See* 29 C.F.R. § 1614.105(a).  "Generally, when the claimant does not initiate contact within the 45-day charging period, the claim is barred ...." *Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008).

*Ramirez v. Secretary, U.S. Dep't of Transp.*, 686 F.3d 1239, 1243 (11th Cir. 2012); *see also Green v. Brennan*, ___ U.S. ___, ___, 136 S. Ct. 1769, 1774 (2016).

### a.    Plaintiff's Complaints on July 24, 2013

Plaintiff's primary argument is that she satisfies the 45-day requirement of 29 C.F.R. § 1614.105(a) based on her reports about Troupe's sexual harassment

18

made on July 24, 2013.  Specifically, she claims to have complained to three

individuals on that date:  (1) her own immediate supervisor, Mostella; (2)

Mostella's immediate supervisor, Todd; and (3) to Rick DeFilippo, the agency's

"EEO Program Manager."  (Doc. 22 at 2).  Plaintiff also characterizes one or more

of those reports on July 24, 2013, as an "internal EEO complaint."  (Compl. ¶ 6;

Doc. 11-9 at 48; Doc. 22 at 2).

The VA also does not now specifically dispute that an initial contact by

Plaintiff with an EEO counselor on July 24, 2013, would be timely.  On that score,

the court notes that contact with an EEO counselor raising a hostile environment

claim is timely so long as all acts which constitute the claim are part of the same

unlawful employment practice and at least one act falls within the 45-day time

period.  *See Perkins v. Lynch*, 169 F. Supp. 3d 1246, 1253 (N.D. Ala. 2016) (citing

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)); *McFarland*

*v. Henderson*, 307 F.3d 402, 408 (6th Cir. 2002).  The VA also does not dispute

Plaintiff's claim that she reported Troupe's sexual harassment to her VA agency

supervisors, Mostella and Todd, on July 24, 2013.  The VA further recognizes that

the record supports Plaintiff completed and signed a "Report of Contact" form that

she gave to Mostella at that time, who, in turn, forwarded it to the VA's Human

Resources Department.  The VA argues, however, that none of those "contacts"

was with an "EEO counselor" as required by the regulation.  The VA also

challenges Plaintiff's factual assertion that she complained to DeFilippo on July

24, 2013.  As a consequence, the VA argues, the record shows that Plaintiff did

not timely contact an EEO counselor based on her complaints on July 24, 2013.

With regard specifically to *whom* a federal employee may contact to meet

her obligation under the EEO counseling regulation, the Eleventh Circuit has

recently explained:

> The EEO Commission ("EEOC") has held that "in order to
> establish EEO counselor contact, an individual must contact an
> agency official logically connected to the EEO process and exhibit an
> intent to begin the EEO process."  *Duke v. Slater*, EEOC Dec.
> 01A02129, 2000 WL 732027, at *1 (E.E.O.C. May 22, 2000).  In
> *Kraus* [*v. Presidio Trust Facilities Division*, 572 F.3d 1039 (9th Cir.
> 2009)], the Ninth Circuit held that an "EEO Officer" of a federal
> employer was an agency official logically connected with the EEO
> process even though she did not have the title "Counselor."  572 F.3d
> at 1044–45.  According to *Kraus*, the EEOC understands agency
> officials "logically connected with the EEO process" to encompass
> EEO personnel with titles other than "counselor," such as EEO
> officers, as well as certain officials who are not EEO personnel, such
> as directors within the agency's office of civil rights.  *Id.* at 1045;
> *accord Culpepper v. Schafer*, 548 F.3d 1119, 1122-23 (8th Cir. 2008)
> (U.S. Department of Agriculture employee's letter to the director of
> that agency's Office of Civil Rights satisfied administrative
> exhaustion).
>
> However, "neither internal appeals[ ] nor informal efforts to
> challenge an agency's adverse action" amount to initiating contact
> with an EEO Counselor.  *See Penn v. Geren*, EEOC Dec.
> 0120082927, 2008 WL 5479277, at *2 (E.E.O.C. Dec. 10, 2008)

> (stating that these actions do not toll the time to contact an EEO
> Counselor); *see also Johnson v. Henderson*, 314 F.3d 409, 415 (9th
> Cir. 2002) ("[T]here is no basis in law to suggest that an employee's
> complaints to her supervisors satisfy the requirement that the
> aggrieved employee seek EEO counseling prior to filing a formal
> complaint or suing in court.").

*Murphree v. Commissioner, Soc. Sec. Admin.*, 644 F. App'x 962, 966 (11th Cir. 2016).

The court first considers Plaintiff's complaints to Mostella and Todd. It is undisputed they are Plaintiff's supervisors within the VA and not EEO personnel. Therefore, her complaints to them could not satisfy the regulation's requirement to seek EEO counseling within 45 days. *See Murphree*, 644 F. App'x at 966.

Plaintiff claims, however, that she also complained on July 24, 2013, to DeFilippo. Unlike Mostella and Todd, DeFilippo is with the agency's EEO office. Although DeFilippo's title is "EEO Program Manager," not "EEO Counselor," it is reasonable to consider him an official "logically connected with the EEO process," *Murphree*, 644 F. App'x at 966, such that, if Plaintiff did make a complaint to him on July 24, 2013, that could satisfy her burden under the regulation. The VA insists, however, that Plaintiff did not, in fact, make such a complaint. In support, the VA highlights DeFilippo's declaration, in which he expressly denies being contacted by Plaintiff about Troupe's alleged harassment

21

until November 2013.[5]  (*See* DeFilippo Decl. ¶¶ 6-7).  The question, then, is: "Did Plaintiff make a complaint to DeFilippo on or about July 24, 2013?"  For the reasons explained below, the court finds she clearly did not.

Plaintiff contends in her brief that she "reported this case" to DeFilippo on July 24, 2013.  (Doc. 22 at 2).  She also pleads in her Complaint that she "filed an EEO internal complaint with the Defendant on July 24, 2013."  (Compl. ¶ 6).  However, the only potential *evidence* to which Plaintiff points in support of either proposition is in the form of allegations appearing in her formal administrative EEO discrimination complaint filed on April 29, 2015.  (*See* Doc. 22 at 2, *citing* Doc. 23 at 6-9).  Specifically, when asked on that form for information on whether she had previously "filed the complaint with anyone else," Plaintiff checked the box marked "yes," along with the explanation: "I filed an in-house EEO Complaint against Mr. Troupe with my supervisor, Rick DeFilippo on July 24, 2013."  (Doc. 23 at 6).  On a sheet she attached to that same form, Plaintiff likewise alleged: "I first reported [Troupe's sexually harassing] conduct to Mr. Rick DeFilippo on July 24, 2013.  On that date I filed an in-house EEO complaint, which DeFilippo never forwarded to any other office."  (*Id.* at 7).  None of those

_____

[5]The VA recognizes that Plaintiff did communicate with DeFilippo November 2013, but the VA contends that such contact was not within 45-days of any sexual harassment occurring prior to Troupe's transfer on July 25, 2013.  The court will consider such issues later in the text.

statements by Plaintiff, however, are either sworn or made under penalty of perjury as provided by 28 U.S.C. § 1746.  Accordingly, the court may discount them as it relates to its findings related whether Plaintiff timely resorted to and exhausted administrative remedies.  *See Simmons v. Prison Health Servs.*, 2010 WL 5508499, at *3–4 (S.D. Ga. Aug. 12, 2010), *report and recommendation adopted*, 2011 WL 31088 (S.D. Ga. Jan. 5, 2011); *cf. Carr v. Tatangelo*, 338 F.3d 1259, 1273 n. 26 (11th Cir. 2003) (the court may disregard unsworn statements offered on a motion for summary judgment); *also see generally Bryant*, 530 F.3d at 1374-77 (recognizing that the court is authorized to resolve disputed issues of fact relevant to an administrative exhaustion defense).

Further, Plaintiff's assertion that she complained to DeFilippo or otherwise submitted an "EEO complaint" on or about July 24, 2013, is inconsistent with the documentary evidence in that it reflects other statements made by Plaintiff herself. To start with, it appears that, in March 2015, Plaintiff told the EEO Counselor, Butler, that she first complained to DeFilippo on November 25, 2013, not in July of 2013. (Doc. 11-8 at 3).  Next, the court observes that Plaintiff frequently refers to her "Report of Contact" created on July 24, 2013,[6] as an "EEO Complaint."

---

[6]Although the "Report of Contact" form is undated, the information supplied by Plaintiff indicates that it was completed on July 24, 2013.  (*See* Doc. 23 at 4) ("On today (sic), July 24th, Jonathan had a conversation ....").

(*See*, *e.g.,* Doc. 16 at 2; Doc. 22 at 2, *citing* Doc. 23 at 6-9).  But there is nothing in that document linking it in any respect to the agency's EEO office or an EEO proceeding.  On its face, the Report of Contact form is generic VA agency form, with no indication that it was designed for lodging complaints about sexual harassment or employment discrimination, with the EEO office or anyone else. (*See* Doc. 23 at 3).  There is also nothing on the document tending to suggest that it was either supplied by DeFilippo or any other EEO official to Plaintiff for completion or that Plaintiff tendered it or otherwise ever complained to DeFilippo or any other EEO official.[7]  (*Id.*)  Rather, Plaintiff documented in the Report of Contact only that she had reported Troupe's sexual harassment to her agency supervisors, Mostella and Todd.  (*Id.* at 4).

That is also just what Plaintiff said when she later wrote to DeFilippo on November 25, 2013.  In her Memorandum of that date, she advised DeFilippo that, on July 24, 2013, she had reported Troupe's sexual harassment "to [her] immediate supervisor, Brenda Mostella RN, and Marie Todd RN who is Brenda's supervisor."  (Doc. 11-9 at 48).  After relating that "both supervisors were very concerned and willing take immediate action," Plaintiff stated:

---

[7]DeFilippo acknowledges that Plaintiff attached a copy of her Report of Contact when she emailed him on November 25, 2013, but he claims not to have received it before that. (DeFilippo Decl. ¶¶ 6-7).

24

> My Point (sic) of Contact report was given to Brenda Mostella the
> very next day, July 25, 2013.  Mrs. Mostella immediately forwarded
> my report to Human Resources and as a result, [Troupe] was
> relocated to another floor.  Since that date, ... I have not heard nor
> been advised of anything concerning this case.

(*Id.*)  Thus, Plaintiff's summary of events to DeFilippo in November 2013

unambiguously recounts that she had up to that point complained to her agency

supervisors with the VA, who had, in turn, involved the agency's human resources

department, and that Troupe had been transferred immediately thereafter.

Incidentally, that is also precisely what Mostella testified to in her EEO

investigation interview.  (Mostella Int. at 5-6, 10-13, 24-25).  Of course, what is

glaringly absent from Plaintiff's November 2013 Memorandum to DeFilippo is

any claim, or even the slightest hint, that Plaintiff had previously complained or

made a report to any EEO personnel, including DeFilippo himself.  That is more

than passing strange insofar as Plaintiff was then directly addressing DeFilippo,

giving him her account of the case's history and asking him for help in the matter.

Plaintiff's assertion that she complained to DeFilippo on July 24, 2013, is

also inconsistent with her sworn testimony in response to questioning by the EEO

investigator in October 2015.  Such inconsistency also supports the court's

discounting of Plaintiff's present position.  *Cf. Van T. Junkins & Associates, Inc.*

*v. U.S. Indust., Inc.*, 736 F.2d 656, 657-58 (11th Cir. 1984) (explaining that under

the "sham affidavit" doctrine, a party cannot create a material issue of material fact at summary judgment by presenting an affidavit that contradicts, without explanation, previously given sworn testimony); *Chalden v. Salazar*, 2011 WL 2550877, at *7 (N.D. Ill. June 27, 2011) (applying "sham affidavit" doctrine based on sworn EEO investigation testimony).

At the outset, although it may be a relatively small matter, the court notes that, in Plaintiff's formal EEO discrimination complaint from April 2015, she says she complained to DeFilippo on July 24, 2013, there calling him "[her] supervisor." (Doc. 23 at 6). However, in her EEO testimony, Plaintiff was clearly asked to identify her supervisors, and she did not name DeFilippo. (Pl. Int. at 4). And when Plaintiff did later talk about DeFilippo in her EEO testimony, she identified him as "the EEO manager of [the] VA," not as her "supervisor." (Id. at 12). Again, DeFilippo has expressly disclaimed that he was ever Plaintiff's "supervisor." (DeFilippo Decl. ¶ 6). Also, when asked by the EEO investigator when she first reported Troupe's sexual harassment "to management or [her] supervisor or [her] nurse manager," Plaintiff responded that she "reported it to them" some time after she returned from maternity leave in May 2013. (Pl. Int. at 18-20). She did not suggest in that testimony, however, that she had also complained at that same time to DeFilippo or any other EEO personnel. (*See id.*)

26

Rather, in her EEO interview, Plaintiff indicates she "was under the impression" she had invoked the EEO process based on certain communications she had with DeFilippo, as follows:

> [S]o it got to the point to where I started having to seek therapy again. And my therapist -- and I did -- I'm sorry, prior -- I did send a letter to the EEO, Rick DeFilippo, [the EEO Manager of the VA], and I contacted him and told him that I wanted to file a complaint for sexual harassment. He advised me to send him an email.
>
> * * *
>
> And I told him I wanted to file the complaint, he told me to send him an e-mail. And that's exactly what I did. And so I was under the impression at that point that I -- that that was filing a complaint.
>
> * * *
>
> [DeFilippo] responded back and scheduled a meeting. And during that time, we had -- we had inclement weather. It was snow, and a lot of people didn't make it to work. I wasn't able to make it to work, and so they -- I asked for the meeting to be rescheduled. My nurse manager said that it ... couldn't be scheduled for the next week because she would be out of town. And so then no meeting, no nothing was scheduled.
>
> Shortly after that, one day I was having so many panic attacks my therapist said that I needed to seek psychiatric help because I needed to be on medications in order for me to work because I couldn't afford to be off.

(Pl. Int. at 12-13).

Although Plaintiff does not identify the date or time period of the communications to which she is referring above, the only reasonable interpretation

is that they are from *November* 2013 and months immediately following, and *not* from *July* 2013 and following.  For one thing, while Plaintiff explained to the EEO investigator that she sent DeFilippo an "email" shortly after she requested in some preliminary verbal communication that she do so, the first "email" in the record from Plaintiff to DeFilippo is dated November 25, 2013.  (*See* Doc. 11-9 at 47-48; *see also* DeFilippo Decl. ¶ 7).  Plaintiff also states in her EEO testimony that she also sent DeFilippo a "letter" at that time.  The record contains only one communication that might be plausibly described as a "letter" from Plaintiff to DeFilippo: the "Memorandum" dated November 25, 2013, that Plaintiff attached to the aforementioned email of the same date.  (*Id.*)  Again, as discussed, the substance of that Memorandum belies that Plaintiff had previously complained to DeFilippo.

Also, Plaintiff's sworn EEO testimony regarding what ensued after contacting DeFilippo is wholly incompatible with the notion that she is talking about events from in or around July 2013.  Namely, Plaintiff testified that DeFilippo responded to her email by scheduling a meeting that had to be canceled because of a snowstorm.  It goes without saying that it does not snow in Birmingham, Alabama, anytime in or near July.  Moreover, Plaintiff's EEO testimony regarding ensuing events lines up perfectly with her more detailed

28

descriptions elsewhere of what she says occurred in the wake of contacting

DeFilippo in late November 2013.  Again, Plaintiff's sworn EEO testimony above

is that after she sent her email and letter to DeFilippo, the following occurred: (1)

he responded by scheduling a meeting that was canceled due to a snowstorm; (2)

that meeting was further delayed because Mostella was "out of town"; (3) the

meeting was not rescheduled after that; and (4) Plaintiff soon afterwards sought

psychiatric help because of repeated "panic attacks."  That is unmistakably the

same timeline she outlines for *January and February 2014* in an attachment to her

formal EEO discrimination complaint, wherein she stated in relevant part:

> The first meeting was scheduled for 1/30/2014 but was cancelled due
> to inclement (snow) weather; clinics were closed and most employees
> were not able to transport safely to work.  The second scheduled
> meeting did not happen because my nurse manager, Brenda Mostella
> stated she would be in a class and requested the meeting to be
> rescheduled for the week of February 9th, 2014.  No other meeting
> was scheduled.  I asked, but received no reply.  Jonathan Troupe
> continued to come to my work area when I was told he shouldn't.  He
> was moved to the 7th floor from the 6th floor where he and I worked
> together.  My work environment was still hostile and I continued to
> feel unsafe.  I was having to increase my intake of medication to
> attempt to control my anxiety attacks at work.  On February 19, 2014,
> I became discouraged, I felt unsupported, severely depressed, suicidal
> and was admitted to Brookwood Hospitals' (sic) Psychiatric Unit.
> My husband signed court ordered documents for me to remain under
> doctor's care for more than 24 hours because he was afraid for my
> life.  On February 27th, 2014 my doctor placed me on [leave under
> the Family Medical Leave Act] due to increased anxiety, severe
> depression and PTSD.

(Doc. 23 at 8).

Based on the foregoing, the court determines that Plaintiff did not, in fact, make initial contact with DeFilippo on July 24, 2013. Nor did the complaints that Plaintiff did make on that date, to her agency supervisors Mostella and Todd, qualify as contacts with an EEO counselor for purposes of 29 C.F.R. § 1614.105(a). Therefore, Plaintiff cannot satisfy her obligation under that regulation to have sought EEO counseling within 45 days of the discriminatory matter based on her complaints of July 24, 2013.

**b.      Plaintiff's Complaints in November 2013 and Thereafter**

Plaintiff also seems to assert, however, that her hostile environment claim is timely based on later complaints or reports she made to EEO personnel. Indeed, there is no dispute that Plaintiff did contact an EEO Counselor in March 2015 and that Plaintiff thereafter filed a formal EEO complaint of discrimination on April 28, 2015. It is also clear that Plaintiff contacted DeFilippo in November 2013 and February 2015, indicating on both occasions that she was dissatisfied with the VA's response to her the sexual harassment complaint. The VA argues, however, that none of those contacts occurred within 45 days of the matter alleged to be discriminatory, even assuming the contacts otherwise satisfied the requirements of

30

29 C.F.R. § 1614.105(a).

The court assumes that each of the above-referenced communications between Plaintiff and DeFilippo or the EEO counselor, Butler, qualifies as contact with an "EEO counselor" within the meaning the regulation. *See Murphree*, 644 F. App'x at 966. However, the earliest among those occurred in November 2013 when Plaintiff spoke with DeFilippo and sent him a follow-up email with attachments. Again, contact with an EEO counselor raising a hostile environment claim is timely so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the 45-day time period. *See Perkins*, 169 F. Supp. 3d at 1253; *McFarland*, 307 F.3d at 408; *see also Morgan*, 536 U.S. at 117. It is also assumed for present purposes that Troupe's sexually graphic remarks and displays of pornographic media were sufficiently severe or pervasive so as to create a hostile work environment in violation of Title VII. Plaintiff admits, however, that after the VA reassigned Troupe to the seventh floor on July 25, 2013, he did not subject Plaintiff to any sort of inappropriate remarks or conduct of a sexual nature. So even if Troupe committed a constituent act of sexual harassment on the day before his transfer, to have timely raised an associated hostile work environment claim, Plaintiff would

31

have had to make initial contact with an EEO counselor by September 9, 2013.[8] Therefore, an initial contact with DeFilippo or Butler in November 2013 or afterwards could not satisfy the regulation's 45-day requirement.

Plaintiff claims, however, that she continued to endure a hostile work environment even after Troupe's transfer on July 25, 2013, right up until he stopped working for the VA in March 2015. In support, she casts the VA's response to her complaints of sexual harassment as not only inadequate but also sexually discriminatory in itself. In this vein, she also emphasizes that, even if Troupe never said anything untoward after his transfer, she was still effectively required to see him on a daily basis and that he would stare or otherwise look at her and make facial expressions indicating he harbored hostility towards her.

But Plaintiff's subjective belief that the VA's response to her complaints was inadequate does not render that response itself a sexually discriminatory act. For starters, even assuming arguendo that the VA's response was legally inadequate, there is nothing in the record to support that such action itself was either motivated by Plaintiff's sex or that it could be reasonably viewed as

---

[8]The 45th day following July 24, 2013, was Saturday, September 7, 2013. However, Plaintiff would have had until the next business day to make contact with an EEO counselor. *See Gardner v. Aviagen*, 454 F. App'x 724, 727 (11th Cir. 2011); *King v. Potter*, 2006 WL 842402, at *4 (E.D.N.Y. Mar. 27, 2006).

harassment or as materially adverse treatment.  But equally to the point, an

employee who complains about sexual harassment does not get to choose the

remedy, so whether Plaintiff was satisfied with the VA's response is not the issue.

*See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1306 (11th Cir.

2007); *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1555 (11th Cir.

1997).  Rather, an employer's remedial response need only be reasonably

calculated to prevent the misconduct from recurring.  *See Baldwin*, 480 F.3d at

1305 (citing *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th

Cir. 1996)).  Broadly speaking, remedies to complaints of sexual harassment

"should be assessed proportionally to the seriousness of the offense." *Ellison v.

Brady*, 924 F.2d 872, 882 (9th Cir. 1991) (quoting *Dornhecker v. Malibu Grand

Prix Corp.*, 828 F.2d 307, 309 (5th Cir. 1987); *Baskerville v. Culligan Intern. Co.*,

50 F.3d 428, 432 (7th Cir. 1995) ("[W]hat is reasonable depends on the gravity of

the harassment.").

Whatever Plaintiff's subjective perceptions of the Troupe's harassment or

her extreme psychological reaction to it, the objective facts of this case involve a

single harassing co-worker who is not alleged to have had either supervisory

authority over Plaintiff or a prior record of harassment complaints against him.

Plaintiff claims that, before his reassignment, Troupe repeatedly made vulgar,

sexually graphic statements; loudly played sexually degrading and explicit music in the office; and showed Plaintiff pornographic media.  And again, it's assumed that such harassment created a hostile work environment because of sex. However, Plaintiff makes no claim that Troupe ever touched her inappropriately or made any threats or express sexual demands upon her.  Under those circumstances, Title VII simply did not entitle Plaintiff to a remedy that would spare her any and all further contact with Troupe.  *See Baldwin*, 480 F.3d at 1305-06 ("We have held that warnings and counseling of the harasser are enough where the allegations are substantiated," *citing*, *inter alia*, *Fleming v. Boeing Co.*, 120 F.3d 242, 246-48 (11th Cir. 1997)); *id.* at 1301 (holding that employer did not violate Title VII by terminating plaintiff because she refused employer's "reasonable remedy" that would have entailed plaintiff either accepting a transfer to another city or continuing to work with the alleged harasser who had been warned against future misconduct and been required to undergo counseling); *Milligan v. Board of Trustees of So. Ill. Univ.*, 686 F.3d 378, 385 (7th Cir. 2012) (rejecting the plaintiff's argument that the employer's "response was ineffective because it did not prevent all contact between him and [the harasser]" because the employer "was not required to completely insulate [the plaintiff] from [the harasser]," and citing cases); *cf. Wilson v. Moulison N. Corp.*, 639 F.3d 1, 8 (1st Cir. 2011) ("[Title VII]

34

does not invariably require termination or suspension as a response to harassment (even serious harassment)," *citing Green v. Franklin Nat. Bank of Minneapolis*, 459 F.3d 903, 912 (8th Cir. 2006)); *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, 511 U.S. 244 (1994) ("Title VII does not require that an employer use the most serious sanction available to punish an offender, particularly where, as here, this was the first documented offense by an individual employee.").

The record shows that, upon receiving what Plaintiff acknowledges to have been her first sexual harassment complaint to a supervisor on July 24, 2013, the VA took corrective action the following day by permanently reassigning Troupe to another floor, thereby separating him from Plaintiff's immediate work environment.  The VA also sternly warned him in writing against future misconduct and required him to undergo counseling.  That remedy was not only reasonably likely to stop Troupe's sexual harassment but also actually did stop it, insofar as Plaintiff concedes that Troupe did not make any further sexually inappropriate remarks or displays of any kind.  *See Baldwin*, 480 F.3d at 1305-06; *Hubbard v. UPS*, 200 F.3d 556, 557-58 (8th Cir. 2000).  Since the VA's remedial action was all Title VII required, Plaintiff's argument that such response was itself a sexually discriminatory act for purposes of extending the 45-day EEO contact

period is plainly without merit.

Plaintiff reiterates, however, that even after Troupe's transfer she was still required to "see" him on a daily basis, when they would go to each other's floors and pass in the hallway, whereupon he would give her dirty looks.  She similarly claims that Troupe once sat across from her and stared at her during a staff meeting.  Plaintiff does not make any other complaints about Troupe's post-transfer conduct.  Nevertheless, she emphasizes that her fear of continuing to see him caused her severe depression, anxiety, PTSD, and panic attacks that required extensive mental health treatment and medications, a seven-month medical leave from February to September 2014, and a four-day hospitalization in February 2015.  The court thus discerns Plaintiff to claim that her encounters with Troupe following his transfer amounted to additional acts of sexual harassment extending both her exposure to a hostile work environment and the 45-day deadline for her to make initial contact with an EEO counselor.  (*See* Doc. 16 at 2 (wherein Plaintiff argues that the "allegations of the Defendant mishandling the sexual harassment Complaint did in fact fall within the forty-five (45) day period to file an EEO Complaint.").  The court disagrees.

The fact that Title VII did not require the VA to completely isolate Plaintiff from Troupe, as discussed above, implies that instances of her merely "seeing"

him in the workplace after his transfer did not itself constitute discriminatory harassment.  Plaintiff also complains, though, not just about Troupe coming within her field of vision but also that, when she did, he would stare or glare at her with an "angry" or "mean" facial expression.  The court concludes, however, that such alleged "harassment" could not extend the 45-day deadline for making a charge about Troupe's misconduct occurring before his transfer, as explained below.

For purposes of determining whether an administrative claim raising a hostile work environment was timely, a discriminatory act of harassment committed on one day may have an insufficient nexus to prior acts of harassment so as to be considered part of the same hostile environment, including because of "intervening action by the employer." *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003) (*quoting Morgan*, 536 U.S. at 118).  That principle applies here.  Troupe's pre-transfer harassment was distinctly in the form of vulgar, sexually graphic, and objectifying verbal remarks; sexually suggestive noises; prying sexual questions; playing music with sexually explicit lyrics; and watching and displaying pornographic photos and videos in the office.  (*See* Compl. ¶ 7). Plaintiff characterizes those incidents as harassment because of *sex* (*see id.* ¶¶ 6-8, 13), and their overt sexual content and degrading nature generally would allow that motivational inference.  *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594

37

F.3d 798, 809-11 (11th Cir. 2010) (en banc); *Livingston v. Marion Bank & Trust Co.*, 30 F. Supp. 3d 1285, 1306-07 (N.D. Ala. 2014).  However, it is undisputed that once Plaintiff complained, the VA immediately intervened, transferring Troupe to another floor and sternly warning him against further misconduct. Plaintiff admits that when that happened, all of Troupe's sex-based harassment came to a screeching halt.  From then on, he and Plaintiff no longer worked side by side.  And although Plaintiff says she continued to see Troupe on a "daily basis," the interactions she describes are relatively brief and intermittent, on occasions when they went to each other's floors, passed each other in hallways, and once when they attended the same training meeting.  Moreover, from all that can be discerned from the record, after the Troupe's reassignment, no words were ever exchanged between them.  Plaintiff insists that Troupe continued to "harass" her in that, when she would see him, he allegedly would stare and look at her with "angry" and "mean" looks.  But such subtle, non-verbal "harassment" is distinctly different both in its *form* and *severity* from the repeated, overtly graphic sexual remarks and displays Plaintiff purportedly endured working along side Troupe, before the VA intervened.  Indeed, there is nothing in the record to support that Troupe's post-transfer "harassment" was based specifically on sex or gender. Rather, according to Plaintiff, Troupe began giving her stares, glares, and dirty

38

looks immediately after he became aware she had *reported him to VA managers for sexual harassment*. Thus, such post-transfer "harassment" is also distinct in its *motivation* insofar as it would represent a form of *retaliation* because Plaintiff complained to their employer about sex discrimination, rather than a form of sexual harassment proper. *See Swindle v. Jefferson Cty. Comm'n*, 593 F. App'x 919, 925 (11th Cir. 2014).

The court concludes that the pervasive, overtly sexual harassment to which Troupe allegedly subjected Plaintiff before the VA intervened and transferred him to a separate floor is sufficiently unrelated to the glares, stares, and dirty looks he gave Plaintiff afterwards such that the they are not part of the same hostile work environment for purposes of the timeliness of her administrative claim. As such, Troupe's non-verbal, post-transfer acts cannot be used to extend the 45-day period in which Plaintiff had to make initial contact with an EEO counselor to raise a hostile work environment claim based on Troupe's earlier sexual harassment. Plaintiff's Title VII claim is therefore barred and due to be dismissed to the extent that it is based on harassment occurring prior to Troupe's transfer on July 25, 2013.

### 2.      Hostile Environment Claim Based on Post-Transfer Harassment

While Plaintiff's Title VII hostile environment claim is untimely as to alleged harassment occurring prior to Troupe's transfer on July 25, 2013, Plaintiff also maintains that she might recover based upon continuing harassment by Troupe thereafter, as discussed above.  It would appear that at least some of that alleged harassment, including specifically when Troupe sat across from Plaintiff in a training meeting and purportedly "stared" at her in a hostile manner, came within 45 days of Plaintiff contacting the EEO Counselor, Butler, in early March 2015. The VA argues, however, that any such claim based on Troupe's post-transfer harassment is due to be dismissed because Plaintiff's allegations regarding such incidents plainly cannot support recovery under Title VII.  The court agrees with the VA.

Plaintiff's allegations of harassment by Troupe subsequent to his transfer boil down to claims that she continued to see him in the workplace on a daily basis, that he would "look" at her with "angry" and "mean" facial expressions, and that he "stared" at her, including in the training meeting.  The court has previously recognized that any such non-verbal, post-transfer "harassment" appears clearly to be based on a *retaliatory* animus on the part of Troupe, stemming from the fact

40

that Plaintiff had *complained* to management that he had sexually harassed her, rather than because of Plaintiff's *sex per se*.  The court notes, though, that Plaintiff's Complaint invokes a Title VII cause of action only for *sexually discriminatory* harassment, not unlawful *retaliation*.[9]  But that is not her real problem.

Rather, the more formidable hurdle for Plaintiff is that, irrespective of whether she might couch Troupe's post-transfer harassment as sexually discriminatory or as retaliation for complaints, her allegations would have to establish that such harassment was so severe or pervasive, viewed both subjectively by Plaintiff and objectively by a reasonable person, that it altered the terms and conditions of her employment and created a hostile work environment. *See Trask*, 822 F.3d at 1195; *Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012).  The court has no doubt that Plaintiff considered her continued exposure to Troupe to be harassing and to have created a hostile environment.  Even so, Title

---

[9]Title VII prohibits an employer from retaliating against an employee because she has opposed an employment practice that violates that Act's substantive anti-discrimination provisions.  *See* 42 U.S.C. § 2000e-3(a).  That provision may authorize a cause of action in favor of an employee who is subjected to hostile work environment in retaliation for having made protected complaints of sex discrimination.  *See Gowski v. Peake*, 682 F.3d 1299, 1311-12 (11th Cir. 2012).  Although Title VII's provision governing federal employees, 42 U.S.C. § 2000e-16, does not specifically mention retaliation, federal employees may bring retaliation claims to the same extent that non-federal employees may do so under § 2000e-3(a).  *See Rives v. Lahood*, 605 F. App'x 815, 818 (11th Cir. 2015) (*citing Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1243 (11th Cir. 1998)).

VII does not set forth "a general civility code for the American workplace."

*Oncale*, 523 U.S. at 80.  Thus, judicial standards for establishing hostile

environment claims must "filter out complaints attacking 'the ordinary tribulations

of the workplace, such as the sporadic use of abusive language, gender-related

jokes, and occasional teasing.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548

U.S. 53, 68 (2006) (*quoting Faragher*, 524 U.S. at 788).  "An employee's decision

to report discriminatory behavior cannot immunize that employee from those petty

slights or minor annoyances that often take place at work and that all employees

experience."  *Id.*  In the end, Troupe's alleged stares, glares, and dirty looks

following the transfer, viewed objectively, simply fall far short of the mark.  *See*

*Mendoza*, 195 F.3d at 1252-53 (conduct alleged by employee, including, inter alia,

supervisor's "constant" following and staring at employee, did not reach level of

severe or pervasive conduct sufficient to alter employee's terms or conditions of

employment, thus defeating hostile environment sexual harassment claim); *Gupta,*

212 F.3d at 585 (holding that assistant professor could not establish hostile

environment claim based on allegations that supervisor stared at her twice,

touched her ring and bracelet once, and kept asking her to lunch); *Vance v. Ball*

*State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011), *aff'd*, 133 S. Ct. 2434 (2013)

("Making an ugly face at someone and staring, while not the most mature things to

do, fall short of the kind of conduct that might support a hostile work environment claim."); *Vital v. National Oilwell Varco*, 2014 WL 4983485, at \*42 (S.D. Tex. Sept. 30, 2014) ("'Silent treatment' and dirty looks, standing alone, do not create a hostile work environment" (citing cases)).

## IV.   CONCLUSION

The VA's motion to dismiss (doc. 11) is due to be **GRANTED**.  A separate final order will be entered.

**DONE**, this 6th day of December, 2016.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge